IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

GARY GUYETTE,                          :
    Plaintiff                          :          No. 1:22-cv-01472
                                       :
v.                                     :          (Judge Kane)
                                       :
AUTOZONE, INC.                         :
    Defendant                          :

## MEMORANDUM

This action arises out of the termination of Plaintiff Gary Guyette ("Plaintiff")'s employment with Defendant AutoZone, Inc.[1] ("Defendant") in August of 2021, which Plaintiff alleges was due to disability discrimination and/or retaliation for protected activity in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951 et seq.  Before the Court is Defendant's motion for summary judgment.  (Doc. No. 23.)  For the following reasons, the Court will grant the motion.

## I.     BACKGROUND

### A.     Factual Background[2]

---

[1]   Defendant represents that it has been improperly named by Plaintiff as AutoZone, Inc. and that its proper name is AutoZoners, LLC.

[2]   The following relevant facts of record are taken from Defendant's statement of material facts (Doc. No. 24) ("SMF") and Plaintiffs' response to Defendant's statement of material facts (Doc. No. 31) ("RSMF"), and are undisputed unless otherwise noted.  Both the SMF and RSMF contain specific citations to the record at each numbered paragraph.  Plaintiff also includes a section of "Facts which Frustrate Summary Judgment" in his RSMF.  (Doc. No. 31 ¶¶ 39–44.)

However, Plaintiff's "Facts which Frustrate Summary Judgment" fail to comport with Local Rule 56.1 of this Court, which contemplates only that a party opposing a motion for summary judgment file a statement of facts "responding to the numbered paragraphs set forth" in the moving party's statement of facts.  See L.R. 56.1.  Therefore, the Court will disregard Plaintiff's statement in connection with its consideration of Defendant's motion, and consider only Plaintiff's numbered responses to Defendant's SMF, in accordance with Local Rule 56.1.  See

Plaintiff was employed by Defendant three times with his last period of employment beginning on or about March 3, 2016 and terminating on or about August 30, 2021.[3]  (Doc. Nos. 24 ¶ 1; 31 ¶ 1.)  Plaintiff held various positions during his employment by Defendant, including serving as a Store Manager on two different occasions,[4] and was employed as a Commercial Sales Manager during his final stint of employment.  (Doc. Nos. 24 ¶¶ 2–3; 31 ¶¶ 2–3.)  Plaintiff's final stint of employment was from 2016 to August 29, 2021.  (Doc. Nos. 24 ¶ 3; 31 ¶

---

Sash v. Hogsten, No. 07-cv-00475, 2009 WL 249649, at *2 (M.D. Pa. Feb. 2, 2009) (providing that L.R. 56.1 "does not provide for a non-moving party to file his own statement of material facts but instructs the nonmoving party how to properly respond to the movant's statement of material facts"); Dreibelbis v. Young, No. 06-cv-02055, 2007 WL 4344120, at *2 (M.D. Pa. Dec. 10, 2007) (stating that, "based on the plain language of Local Rule 56.1, Plaintiff's filing of his own Motion and Statement of Material Facts is not technically sufficient to either oppose Defendants' Motion or deny Defendants' Statement of Material Facts.").  Although Plaintiff's "Facts which Frustrate Summary Judgment" are not directly responsive to Defendant's SMF, the Court may consider the entire record to ascertain the relevant factual background for this matter, but the Court "will assign [Plaintiff's "Facts which Frustrate Summary Judgment] no evidentiary value."  See Rau v. Allstate Fire & Cas. Ins. Co., No. 16-cv-00359, 2018 WL 6422121, at *2 (M.D. Pa. Dec. 6, 2018); see also Williams Controls, Inc. v. Parente, Randolph, Orlando, Carey & Associates, 39 F. Supp. 2d 517, 519 n.1 (M.D. Pa. 1999) (considering the entire record "to ascertain the relevant factual background").

Throughout the RSMF, Plaintiff responds to many of Defendant's facts and referenced documents (Doc. Nos. 24-2, 24-3, 24-4, 24-5, 24-5, 24-6, 24-7, 24-8, 24-10, 24-11, 24-12, 24-13, 24-14) as follows: "Any characterization of the document is disputed as the document speaks for itself" without designating a citation or specific fact contained therein (or citing to the same exhibit as Defendant that does not dispute Defendant's assertion).  See (Doc. No. 31 ¶¶ 6, 8, 13–14, 16, 22–23, 26, 30–32, 36).  Plaintiff does not appear to the contest the truth and accuracy of the documents.  The Court deems admitted those statements that Plaintiff did not properly deny.

[3]  Defendant states that Plaintiff was terminated on August 29, 2021, and Plaintiff states that he was terminated on or about August 30, 2021.  (Doc. Nos. 24 ¶ 1; 31 ¶ 1.)  However, in his RSMF, Plaintiff later agrees with Defendant that his employment as a Commercial Sales Manager ended on August 29, 2021.  See (Doc. Nos. 24 ¶ 3; 31 ¶ 3).

[4]  Plaintiff does not dispute that he was a Store Manager, but notes that he served as Store Manager "from on or about January 5, 2003 through on or about July 8, 2004, and from on or about December 4, 2011 through on or about January 20, 2013."  (Doc. No. 31 ¶ 2.)

3.)  In his positions as a Store Manager and a Commercial Sales Manager, Plaintiff was expected

to know[5] and enforce Defendant's policies and procedures.  (Doc. Nos. 24 ¶¶ 4–5; 31 ¶¶ 4–5.)

Plaintiff acknowledged to Defendant that he read and agreed to comply with Defendant's

policies and procedures at least eleven (11) times during his employment.  (Doc. Nos. 24 ¶ 6; 31

¶ 6.)[6]  Plaintiff printed a store handbook so that he could review policies and procedures as

needed during his employment.  (Doc. Nos. 24 ¶ 7; 31 ¶ 7.)  The "Respect in the Workplace"

policy, which was among these Plaintiff acknowledged at least eleven (11) times, prohibited

disability discrimination, and stated that any request for a disability-related accommodation must

be made to Human Resources.  (Doc. Nos. 24 ¶ 8; 31 ¶ 8.)

On April 4, 2021, Plaintiff was seen at the emergency room ("ER") at the Lebanon VA

Medical Center.[7]  See (Doc. No. 24-4 (April 4, 2021 Doctor's Note) at 1).  That same day,

Plaintiff provided Defendant with a doctor's note stating that he could return to work on April

12, 2021 without any work restrictions. (Doc. Nos. 24 ¶ 13; 31 ¶ 13.)[8]  On April 8, 2021,

---

[5]  Plaintiff admits that in order to enforce Defendant's policies and procedures, he had to know them.  (Doc. Nos. 24 ¶ 5; 31 ¶ 5.)

[6]  Defendant states that "Plaintiff acknowledged to the Company that he read and agreed to comply with [Defendant]'s policies and procedures at least eleven (11) times during his employment."  (Doc. No. 24 ¶ 6.)  Plaintiff asserts that "[a]ny characterization of the document is disputed as the document speaks for itself.  It is undisputed that Plaintiff acknowledged that he read and agreed to comply with [Defendant]'s policies and procedures multiple times during his employment with [Defendant]."  (Doc. No. 31 ¶ 6.)  However, as noted supra at note 2, this fact is deemed admitted because Plaintiff did not properly deny the factual assertion.

[7]  VA is an abbreviation for the United States Department of Veterans Affairs or Veterans Affairs.  Based on the briefing and circumstances of this case, it appears that Plaintiff is a veteran, but the parties do not discuss this fact in the SMF and RSMF.  See (Doc. No. 24-13 at 2.)

[8]  A copy of this note is docketed at Docket Number 24-4 and states as follows:

RETURN TO WORK INSTRUCTIONS

3

Plaintiff contacted Defendant's benefits department through Tasha Ajayi ("Ajayi"),[9] to request a leave of absence from April 12, 2021 to April 23, 2021, due to a "serious health condition." (Doc. Nos. 24 ¶ 14; 31 ¶ 14).[10]  Defendant granted Plaintiff's request for a leave of absence beginning in April of 2021.  (Doc. Nos. 24 ¶ 15; 31 ¶ 15.)

On April 14, 2021, Plaintiff submitted a doctor's note stating that he had been treated for a "cardiac condition" and that "he feels that he cannot perform his duty at his work."  (Doc. Nos. 24 ¶ 16; 31 ¶ 16.)  Plaintiff admitted that he could not work at all between April 3, 2021 and June 24, 2021.  (Doc. Nos. 24 ¶ 17; 31 ¶ 17.)  The parties dispute whether April 3, 2021 or April 4, 2021 was Plaintiff's last day working for Defendant.  (Doc. Nos. 24 ¶ 18; 31 ¶ 18.)  Plaintiff testified that, as of April 4, 2021, he did not know if or when he'd be able to return to work.  See (Doc. Nos. 24 ¶ 19; 31 ¶ 19) (citing Doc. No. 24-2 (Plaintiff's deposition transcript) at 23, Tr. 48:4–12).  The parties agree that Plaintiff did not provide medical documentation to Defendant stating that Plaintiff could work on a part-time basis, but Plaintiff claims that he "communicated

---

GARY GUYETTE was discharged on 04/04/2021.  GARY should be able to return to work 12 of April 2021 regular duty.
GARY needs the following work limitations:  without restrictions, patient was seen in the ER on 4 April 2021, advised to follow-up with his PCP as soon as possible for recheck.

See (Doc. No. 24-4 at 1) (formatting and capitalization in original).

[9]  It appears that Ajayi worked for Defendant's benefits department, but the parties do not explicitly note her title or role.

[10]  Plaintiff states that "[i]t is undisputed that the document reads: 'Absence Type Leave of Absence' and 'Absence Reason Serious health condition' under the Absence Request Details section."  (Doc. No. 31 ¶ 14.)

verbally" that he could work part-time.  <u>See</u> (Doc. Nos. 24 ¶ 20; 31 ¶ 20) (citing Doc. No. 24-2

(Plaintiff's deposition transcript) at 7, 18, Tr. 14:6–10, 30:18–21).

Plaintiff applied to UNUM (the company that handles Defendant's short-term and long-

term disability benefits)[11] for short-term disability benefits.[12]  (Doc. Nos. 24 ¶ 21; 31 ¶ 21.)  As

of June 24, 2021, Plaintiff testified that he told his doctor that he was not ready to come back to

work in any capacity.  <u>Compare</u> (Doc. No. 24 ¶ 22 with Doc. No. 31 ¶ 22).[13]  The parties dispute

Plaintiff's testimony concerning UNUM.  <u>Compare</u> (Doc. No. 24 ¶ 9 with Doc. No. 31 ¶ 9).[14]

Defendant states that Plaintiff admitted that he was truthful in all of his communications with

---

[11]  Short-term disability benefits and long-term disability benefits are sometimes referred to as STD and LTD.

[12]  Based on Plaintiff's deposition transcript, it appears that Plaintiff provided statements to UNUM on June 24, 2021.  <u>See</u> (Doc. No. 24-2 (Plaintiff's deposition transcript) at 20, Tr. 38:17–25).

[13]  Although Defendant asserts that Plaintiff stated that "he was completely unable to work in any capacity" (Doc. No. 24 ¶ 22), Plaintiff cites his deposition transcript wherein he "testified that he represented to his doctor that he was not ready to come back to work in any capacity."  <u>See</u> (Doc. No. 31 ¶ 22) (citing Doc. No. 24-2 (Plaintiff's deposition transcript) at 28, Tr. 53: 11–15).

[14]  Defendant asserts that "Plaintiff testified that he knew that request for short-term or long-term disability payments needed to be made through UNUM, which he knew was a <u>completely separate company</u> from [Defendant] and made decisions independently of [Defendant]."  <u>See</u> (Doc. No. 24 ¶ 9) (emphasis in original).  However, Plaintiff disputes Defendant's characterization of his testimony, stating that:

> Plaintiff testified that he understands that U[NUM] was a separate third-party entity from [Defendant]; that he understands that [Defendant] does not make the determination as to whether or not someone is entitled to short- or long-term disability benefits, "that is nothing on [Defendant]"; and that he understood, in a way, that because U[NUM] is the one that has the medical records that makes the determination as to whether he is entitled to benefits.

<u>See</u> (Doc. No. 31 ¶ 9) (citing Doc. No. 24-2 (Plaintiff's deposition transcript) at 12–13, Tr. 23:16–24:5).

UNUM, but Plaintiff disputes this by stating that "Plaintiff testified that he recalled speaking to claims people from [UNUM] and was honest with them." <u>Compare</u> (Doc. No. 24 ¶ 10 with Doc. No. 31 ¶ 10).  It is undisputed that Plaintiff was truthful in all of his communications with his various medical providers.  (Doc. Nos. 24 ¶ 11; 31 ¶ 11.)  UNUM approved Plaintiff's request for short-term disability benefits between April and July 3, 2021.[15]  (Doc. Nos. 24 ¶ 23; 31 ¶ 23.)

Plaintiff testified that he felt, as of July 3, 2021, that he needed additional time off from work.  (Doc. Nos. 24 ¶ 24; 31 ¶ 24.)  Plaintiff applied for Social Security Disability Insurance ("SSDI") and benefits from the VA Administration, and in his applications claimed that he was completely disabled from working at that point in time.  (Doc. Nos. 24 ¶ 25; 31 ¶ 25.)  Plaintiff admitted that "he was truthful in communications he made or were made on his behalf with the Social Security and VA Administration office when he sought to obtain disability benefits from the government."  (Doc. Nos. 24 ¶ 12; 31 ¶ 12.)  In July 2021, Plaintiff sent an email to Ajayi and asked, "whether his continued leave of absence with [Defendant] (set to expire on July 4,

---

[15]  The Court notes that the parties cite Docket Numbers 24-7 and 24-8 in support of this fact. Docket Number 24-7 is a letter addressed to Plaintiff from Defendant wherein Defendant states that Plaintiff's leave of absence was approved and encloses Defendant's "Leave of Absence [G]uide."  (Doc. No. 24-7 at 1.)  The letter states that Plaintiff's "request for a leave of absence has been approved from April 03, 2021 to June 24, 2021."  (<u>Id.</u>)  Docket Number 24-8 is a letter from UNUM to Plaintiff, dated June 24, 2021, that states:

> Thank you for providing us with the information we needed to extend the approval of your Short Term Disability claim. Your claim has been approved for benefit payment for the maximum duration of your employer's 11 week plan. These benefits will end on July 03, 2021.

> Your claim is approaching a point where Short Term Disability benefits will end and your claim will be considered for benefits under the Long Term Disability plan.

(Doc. No. 24-8 at 2.)  Ajayi is copied on the letter and appears to have received the letter via email.  (<u>Id.</u> at 1–3.)

2021), had been approved."[16]  (Doc. Nos. 24 ¶ 26; 31 ¶ 26.)   Defendant granted Plaintiff's request for more leave.  <u>Compare</u> (Doc. No. 24 ¶ 27 with Doc. No. 31 ¶ 27).

Plaintiff then applied for long-term disability benefits from UNUM, and "knew that if he was actually able to work, his application would be denied."  <u>Compare</u> (Doc. No. 24 ¶ 28 with Doc. No. 31 ¶ 28).[17]  The parties do not agree on why Plaintiff sought long-term disability benefits.  <u>Compare</u> (Doc. No. 24 ¶ 29 with Doc. No. 31 ¶ 29).  Although Defendant asserts that Plaintiff continued to believe he was not able to work at all (Doc. No. 24 ¶ 29), Plaintiff claims that he sought long-term disability benefits "because that was what normally happens and that he still could not work at the time" (Doc. No. 31 ¶ 29).  UNUM initially denied Plaintiff's application for long-term disability in early August 2021 because UNUM believed that Plaintiff was able to work.  (Doc. Nos. 24 ¶ 20; 31 ¶ 30.)[18]   On August 25, 2021, Defendant sent a letter to Plaintiff, stating that: "he either needed to return to work or provide [Defendant] with updated medical information" or Defendant "would consider him to have resigned."  (Doc. Nos. 24 ¶ 31;

---

[16]  The email appears to have been sent by Plaintiff to Ajayi on July 13, 2021 and a copy of the relevant email conversation is docketed at Docket Number 24-10.  <u>See</u> (Doc. No. 24-10).  In the first email, Plaintiff stated that "I would like to know has my [leave of absence] [b]een approved.  Also [I] wanted [to] advise you [I] have been scheduled for an occupational Examination for U[NUM]."  (<u>Id.</u>)  In response, Ajayi asked for Plaintiff's employee ID number.  (<u>Id.</u>)  After Plaintiff provided his employee ID number, Ajayi informed Plaintiff that his short-term disability claim was approved and that she observed that he applied for long-term disability.  (<u>Id.</u>)  Ajayi also states that, "[i]f you are asking has your LTD claim been approved.  Please call U[NUM]."  (<u>Id.</u>)

[17]  Plaintiff disputes this by stating that "Plaintiff testified that he understood that if UNUM found he was able to work they would deny his long-term disability request."  (Doc. No. 31 ¶ 28.)

[18]  UNUM's letter to Defendant, dated August 23, 2021, states that: "We have not approved [Plaintiff]'s request for benefits as they are not disabled from performing the material and substantial duties of their occupation."  <u>See</u> (Doc. No. 24-11).

31 ¶ 31.)[19]  Plaintiff did not do either and was separated from Defendant in late August 2021.

(Doc. Nos. 24 ¶ 32; 31 ¶ 32.)[20]

Defendant asserts that, at the time that Plaintiff received the August 25, 2021 letter,

Plaintiff remained completely unable to work (Doc. No. 24 ¶ 33), whereas Plaintiff claims that

he did not agree with UNUM's doctor who concluded that Plaintiff was able to return to work

and that Plaintiff believed he was not able to return to work (Doc. No. 31 ¶ 33).  However, the

parties agree that Plaintiff did not know when he would be able to return to work.  (Doc. Nos. 24

¶ 34; 31 ¶ 34.)  Although Defendant states that Plaintiff "wanted [Defendant] to continue his

leave of absence indefinitely," Plaintiff disputes this and claims that he asked Defendant "to

---

[19]  In the letter to Plaintiff, Defendant writes, in relevant part, that:

> We have not heard from you and additional information is needed to extend your
> Leave of Absence.  You are currently on a **leave of absence, this is the last notice
> you will receive**.

> Contact with the AutoZone Benefits Department while on a Leave of Absence is
> very important.  The AutoZone handbook states that when you are absent, you are
> responsible for providing documentation that will excuse your absence.  AutoZone
> considers unauthorized absenteeism to be a serious violation of our company policy
> that may result in termination.

> . . . .

> If the information is not received or if you do not contact us regarding this request
> within **three days** of your receipt of this notice, we will accept your failure to
> respond as a **voluntary resignation**.

See (Doc. No. 24-12) (emphasis and formatting in original).

[20]  The parties do not state a specific date in the SMF or RSMF, respectively, but the exhibits
submitted by Defendant provide two dates.  Docket Number 24-13 is the declaration of Joshua
Haulman ("Haulman"), a District Manager for Defendant, wherein Haulman declares that
Plaintiff was separated from Defendant on or about August 30, 2021.  (Doc. No. 24-13 at 1.)
However, the attachment to Haulman's declaration shows that Plaintiff's termination occurred on
August 29, 2021.  (Id. at 2.)  Docket Number 24-1 is Defendant's employment history record
which lists Plaintiff's date of termination as August 30, 2021.  (Doc. No. 24-1 at 3.)

extend his medical leave indefinitely until he figured out when he would be able to return to work."  Compare (Doc. No. 24 ¶ 34 with Doc. No. 31 ¶ 34).

The parties agree that Plaintiff appealed UNUM's decision, but Defendant claims that Plaintiff communicated to UNUM "that he was completely unable to perform any work," (Doc. No. 24 ¶ 35) while Plaintiff states that "he believed that he was unable to work at that time" (Doc. No. 31 ¶ 35).  UNUM granted Plaintiff's appeal for long-term disability because he received SSDI payments "based on his representation to the Social Security Administration that he could not work at all."  (Doc. Nos. 24 ¶ 36; 31 ¶ 36.)  Plaintiff admitted that, at his deposition in November 2023, he had not been able to work since April 4, 2021.  (Doc. Nos. 24 ¶ 37; 31 ¶ 37.)  The parties agree that Plaintiff has not looked for work since his termination, but disagree as to why Plaintiff has not looked for work since his termination.  Compare (Doc. No. 24 ¶ 38 with Doc. No. 31 ¶ 38).  Defendant states that Plaintiff has not looked for work because he believes that he remains completely unable to work.  (Doc. No. 24 ¶ 38.)  In response, Plaintiff claims that "he has not looked for work since his termination because, while in his own mind he believed he could work part-time, he subsequently learned he physically could not," and that "his heart was set on returning to work and helping his store despite his physical condition."  (Doc. No. 31 ¶ 38.)

B.    **Procedural Background**

On September 20, 2022, Plaintiff filed a complaint alleging the following claims: (1) disability discrimination, failure to accommodate, and failure to engage in the required interactive process in violation of the ADA; (2) disability discrimination, failure to accommodate, and failure to engage in the required interactive process in violation of the PHRA; (3) retaliation in violation of the ADA; and (4) retaliation in violation of the PHRA.  (Doc. No.

1.)  After Defendant filed an answer on January 11, 2023 (Doc. No. 6), the case was randomly selected for mandatory referral to court-annexed mediation in accordance with Standing Order 04-3 (Doc. No. 8).  On March 2, 2023, the Court held an initial case management conference with the parties and referred the parties to mediator Joseph A. Barrett, Esq.  (Doc. Nos. 14–15.) On April 20, 2023, mediator Joseph A. Barrett, Esq. filed a report informing the Court that no settlement between the parties had been reached.  (Doc. No. 19.)  On May 18, 2023, the Court held a post-mediation status conference with the parties and set a close of fact discovery date of November 30, 2023.  (Doc. Nos. 20–21.)

On December 11, 2023, Defendant filed a motion for summary judgment as to all claims in Plaintiff's complaint.  (Doc. No. 23.)  Defendant also filed a supporting brief and statement of undisputed material facts ("SMF").  (Doc. Nos. 24–25.)  On January 23, 2024, Plaintiff filed an answer to the statement of undisputed material facts ("RSMF") and a brief in opposition to the motion.  (Doc. Nos. 31–32.)  On February 2, 2024, Defendant filed a reply brief.  (Doc. No. 33.) Accordingly, the motion for summary judgment is ripe for disposition.

## II.   LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  See Fed. R. Civ. P. 56(a).  A factual dispute is material if it might affect the outcome of the suit under the applicable law, and it is genuine only if there is a sufficient evidentiary basis to permit a reasonable factfinder to return a verdict for the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49 (1986). At summary judgment, the inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a

matter of law.  See id. at 251–52.  In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion."  See A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).  The inference(s) drawn in favor of the non-moving party cannot be improbable.  See In re Weinstein Co. Holdings, LLC, 997 F.3d 497, 510 (3d Cir. 2021).  The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine dispute of material fact.  See Conoshenti v. Pub. Serv. Elec. & Gas. Co., 364 F.3d 135, 145–46 (3d Cir. 2004).  Once the moving party has shown that there is an absence of evidence to support the non-moving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."  See Berckeley Inv. Grp. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is warranted.  See Celotex, 477 U.S. at 322.  With respect to the sufficiency of the evidence that the non-moving party must provide, a court should grant a motion for summary judgment when the non-movant's evidence is merely colorable, conclusory, or speculative.  See Anderson, 477 U.S. at 249–50.  There must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts.  See id. at 252.  Summary judgment is not precluded by irrelevant or unnecessary factual disputes.  See Lower Susquehanna Riverkeeper v. Keystone Protein Co., 520 F. Supp. 3d 625, 637 (M.D. Pa. 2021).

## III.    DISCUSSION

As noted underlined supra, Defendant moves for summary judgment as to Plaintiff's claims of disability discrimination, failure to accommodate, failure to engage in the interactive process, and retaliation.  The Court reviews Plaintiff's claims exclusively under the ADA framework because the United States Court of Appeals for the Third Circuit ("Third Circuit") has determined that the PHRA is merely the state analog of the ADA.  See Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999) (stating that "we will only discuss Taylor's ADA claim because our analysis of an ADA claim applies equally to a PHRA claim.").  The Court will address Plaintiff's Count I and II disability discrimination claims together, and then address Plaintiff's Count III and IV retaliation claims together.  For each set of claims, the Court will first discuss the applicable legal standards and the arguments of the parties before analyzing each claim.

### A.    Defendant's Motion for Summary Judgment As to Plaintiff's Disability Discrimination and Failure to Accommodate Claims (Counts I and II)

Counts I and II include disability discrimination, failure to accommodate, and failure to engage in the interactive process[21] claims under the ADA and PHRA, respectively.

#### 1.    Applicable Legal Standards

##### a.    Prima Facie Discrimination

Under the ADA, employers are prohibited from discriminating "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee

---

[21]  The failure to engage in the interactive process is not an independent cause of action because employee and employer's obligations in the interactive process implicate whether an employer reasonably accommodated the employee.  See Taylor, 184 F.3d at 314 (noting that, when an employer is on notice that an employee may have a disability, an employee's request for an accommodation triggers the employer's obligation to participate in the interactive process).

12

compensation, job training, and other terms, conditions, and privileges of employment."  See 42 U.S.C. § 12112(a).  To establish a prima facie discrimination claim under Title I of the ADA, a plaintiff must demonstrate that (1) "he is a disabled person within the meaning of the ADA"; (2) "he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer"; and (3) "he has suffered an otherwise adverse employment decision as a result of discrimination."  See Shaner v. Synthes, 204 F.3d 494, 500 (3d Cir. 2000); see also 42 U.S.C. § 12101.

As to the first prong, a "disability" is defined as "a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual," "a record of such impairment," or "being regarded as having such an impairment."  See 42 U.S.C. §§ 12102(1)(A)–(C).  Second, the ADA defines a "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  See 42 U.S.C. § 12111(8).  To determine whether an individual with a disability is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer, the Court must undertake a two-step inquiry:

> First, the Court must evaluate if the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc.  Second, the court must determine whether or not the individual can perform the essential functions of the position held or desired, with or without reasonable accommodation.

See Gaul v. Lucent Techs., Inc., 134 F.3d 576, 580 (3d Cir. 1998) (citation omitted).  "The determination of whether an individual with a disability is qualified is made at the time of the employment decision."  Gaul, 134 F.3d at 580.  However, "the question is not merely whether [the plaintiff] could perform the essential functions of his job but rather could [he] perform the

essential functions with or without a reasonable accommodation." See Reyer v. Saint Francis Country House, 243 F. Supp. 3d 573, 594 (E.D. Pa. 2017).  Third and finally, "an adverse employment action is one which is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment."  See Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001) (citation omitted).

As a general matter, the plaintiff bears the initial burden of establishing a prima facie case of discrimination.  See Jones v. Sch. Dist. of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)).[22]  "If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.'" Shaner, 204 F.3d at 500 (citation omitted).  If the defendant points to a legitimate, nondiscriminatory reason for its action, a plaintiff must, to defeat a motion for summary judgment, "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  See Semcheski v. Cunningham Lindsey U.S., Inc., No. 16-cv-01592, 2018 WL 3417219, at *3 (M.D. Pa. July 13, 2018) (citing Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 523 (3d Cir. 1992)). "If the plaintiff has pointed to evidence sufficient to discredit the defendant's proffered reasons, to survive summary judgment the plaintiff need not also come forward with additional evidence of discrimination beyond his prima facie case."  Id.

---

[22]  The following burden-shifting framework is referred to as the "McDonnell Douglas test" because the framework was articulated by the Supreme Court of the United States in McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973).

b.      **Failure to Accommodate**

Adverse employment decisions under the ADA include "not only adverse actions motivated by prejudice and fear of disabilities, but also . . . . failing to make reasonable accommodations for a plaintiff's disabilities."  See Mercer v. SEPTA, 26 F. Supp. 3d 432, 440 (E.D. Pa. 2014) (quoting Taylor, 184 F.3d at 306) (internal quotations omitted).  Under the ADA, an employer must reasonably accommodate "the known physical or mental limitations of an otherwise qualified individual with a disability" unless the individual's employer "can demonstrate that the accommodation would impose an undue hardship on the operation of the business."  See 42 U.S.C. § 12112(b)(5)(A).   The ADA provides that reasonable accommodations can include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities."  See 42 U.S.C. § 12111(9)(B).

Both employer and employee "have a duty to assist in the search for appropriate reasonable accommodation and to act in good faith."  See Mengine v. Runyon, 114 F. 3d 415, 420 (3d Cir. 1997).  An employer breaches the duty to provide a reasonable accommodation when (1) "the employer knew about the employee's disability"; (2) "the employee requested accommodations or assistance for his or her disability"; (3) "the employer did not make a good faith effort to assist the employee in seeking accommodations"; and (4) "the employee could have been reasonably accommodated but for the employer's lack of good faith."  See Williams v. Phila. Hous. Auth. Police Dept., 360 F. 3d 751, 772 (3d Cir. 2004).  In handling a disabled employee's request for a reasonable accommodation, "both parties have a duty to assist in the

15

search for appropriate reasonable accommodation and to act in good faith" during the interactive process.  See Taylor, 184 F.3d at 312 (quoting Mengine, 114 F.3d at 420).  "The interactive process does not dictate that any particular concession must be made by the employer; nor does the process remove the employee's burden of showing that a particular accommodation rejected by the employer would have made the employee qualified to perform the job's essential functions."  Id. at 317.  "Because employers have a duty to help the disabled employee devise accommodations, an employer who acts in bad faith in the interactive process will be liable if the jury can reasonably conclude that the employee would have been able to perform the job with accommodations."  Id.

### 2.  Arguments of the Parties

As to Plaintiff's prima facie discrimination claim, Defendant first argues that Plaintiff is estopped from asserting that he is a qualified individual with a disability, noting that this Court has recognized that:

> when an employee claims to be totally disabled for the purposes of seeking benefits, that employee cannot then claim he or she is a qualified individual with a disability absent a clear explanation that would warrant a reasonable factfinder to conclude that, despite representations that the employee is unable to work, the employee was nevertheless qualified to perform the essential functions of the job, with or without a reasonable accommodation.  Jones v. Southcentral Empl. Corp., No. 1:05-CV-1504, 2007 U.S. Dist. LEXIS 37579, *17–41 (M.D. Pa. May 23, 2007) (J. Kane)[.]  In Jones, the employee sought SSDI benefits and represented that she could not perform her job.  Specifically, she told the SSA that she had difficulty walking, using her hands for basic functions, writing, driving a car, sitting for minimal periods of time, and walking.  She also told her own doctors that she was incapable of working.  The "essential functions" set forth in her job description including, among other things, sitting, walking, driving, and computer work.  The employee argued that the differing statutory standards between the ADA and for receiving SSDI benefits (which do not require any reasonable accommodation) sufficiently provided an explanation for her inconsistent positions.  This Court rejected that argument . . . .
>
> . . . .

> Similarly, in this matter, Plaintiff has no plausible explanation for his inconsistent statements between: (1) claiming to UNUM and the SSA and his doctors that he was completely unable to work such that he could and did receive STD, LTD and SSA benefits; and (2) coming to this Court to claim that he could perform his job with a reasonable accommodation.

(Doc. No. 25 at 10, 12.)  Defendant remarks that, given Plaintiff's prior repeated representations that he could not perform his job with Defendant, or any job whatsoever, Plaintiff is now unable to claim he was "qualified" for his job.  (Id. at 12.)  Defendant maintains that "Plaintiff's inability to establish that he was a qualified individual with a disability is fatal to both his disability discrimination and failure to accommodate claims."  (Id. at 14–15.)  Defendant also claims that Plaintiff's request for indefinite leave is not a reasonable accommodation as a matter of law.  (Id. at 15.)  Accordingly, Defendant argues that "Plaintiff's inability to prove that he was a qualified individual with a disability automatically means he cannot show he was fired due to a disability." (Id. at 16.)  Defendant notes that Plaintiff admitted in his deposition that he did not return to work or provide Defendant with any documentation to extend Plaintiff's leave of absence.  (Id. at 17.)  On that basis, Defendant claims that it treated Plaintiff's separation as "a voluntary resignation simply due to his inability to return to work," and that Plaintiff "has no evidence that [Defendant] knew of any disability at the time he was separated."  (Id.)

In response, Plaintiff maintains that "there is no question that Plaintiff was disabled and that he suffered an adverse employment action, which was the denial of any further extension of his leave request and his termination."  (Doc. No. 32 at 9.)  Plaintiff claims that requesting a leave of absence may be considered a reasonable accommodation.  (Id. at 11.)  Plaintiff

maintains that he received conflicting notices from Defendant concerning his long-term

disability benefits.  (Id.)[23]  Plaintiff maintains that:

> [d]espite both of the conflicting notices, Defendant elected to notify Plaintiff only
> that he had three days to contact Defendant regarding his leave of absence. The
> letter, dated August 25, 2021, does not indicate it was a same-day delivery. (See
> Ex. L).  August 25, 2021 was a Wednesday, and a factfinder could infer that
> Monday, when Plaintiff contacted Defendant, was the soonest business day he
> could contact Defendant.  See RSUMF ¶41.  Defendant did not wait, however, to
> terminate Plaintiff based on Plaintiff's conversations with Defendant. Despite
> Defendant's documentary evidence indicating a different date, this Court cannot
> conclude those dates are accurate given the credibility determination required.
> Plaintiff testified at his deposition that he was told he was terminated in the system
> the same date as the letter, which would have been before his receipt.  A factfinder
> could infer that Defendant failed to engage in the interactive process in good faith
> and therefore violated the ADA and PHRA's requirements to engage in the
> interactive process regarding accommodations in good faith.

(Id. at 11–12.)  Plaintiff posits that, had Defendant engaged in the interactive process, "Plaintiff

believes at least that there was a possibility he could have returned to work part-time."  (Id. at

12.)  He also disputes Defendant's assumption that Plaintiff was requesting an indefinite amount

of leave and claims he requested only "just a sufficient amount to allow him to determine the full

extent of his medical issues and the nature of what would be required for him to return to work."

(Id.)  Plaintiff asserts that, because a factfinder should determine whether or not he was a

---

[23]  In support of this contention, Plaintiff includes a section of "Facts which Frustrate Summary
Judgment" in the RSMF, alleging as follows:

> 39.    UNUM approved Plaintiff's Long Term Disability benefits on August 6,
>        2021, with a benefits begin date of July 3, 2021. ([Doc. No. 31-3 at 2–3]).
>
> 40.    Despite the letter approving Plaintiff's Long Term Disability Benefits sent
>        to AutoZone, AutoZone was also sent a notice dated allegedly August 23,
>        2021 indicating that Plaintiff's Long Term Disability benefits were not
>        approved. ([Doc. No. 31-4 at 2–3]).

(Doc. No. 31 ¶¶ 39–40.)  As noted supra at note 2, this section is not properly before the
Court.  However, the Court can consider the record as a whole.

qualified individual with a disability as well as whether Defendant failed to engage in the
interactive process, Defendant's motion for summary judgment should be denied.  (Id.)

      **3.**      **Whether Defendant is Entitled to Summary Judgment on Plaintiff's
Disability Discrimination and Failure to Accommodate Claims
(Counts I and II)**

      **a.**      **Prima Facie Discrimination Claim**

As discussed <u>supra</u>, to establish a prima facie discrimination claim under Title I of the
ADA, a plaintiff must demonstrate that (1) "he is a disabled person within the meaning of the
ADA"; (2) "he is otherwise qualified to perform the essential functions of the job, with or
without reasonable accommodations by the employer"; and (3) "he has suffered an otherwise
adverse employment decision as a result of discrimination."  <u>See</u> <u>Shaner</u>, 204 F.3d at 500.  The
parties do not dispute that Plaintiff is a disabled person with the meaning of the ADA, but
dispute the second and third prongs.  The parties do not directly discuss Plaintiff's medical
condition, but based on a review of the evidence of record, it appears that Plaintiff suffers from
the following conditions: diabetes mellitus, shortness of breath  and leg swelling when standing
for prolonged periods of time since his COVID-19 hospitalization in November 2020, congestive
heart failure that requires a pacemaker and defibrillator, stress, fatigue, neuropathy, post-
traumatic stress disorder ("PTSD"), cellulitis, and sleep apnea.  <u>See e.g.</u>, (Doc. Nos. 24 ¶ 16; 24-
2 at 27, 51–52, Tr. 52:2–20, 125:1–126:19 (Plaintiff's deposition transcript); 24-2 at 54–57
(UNUM claim document authored by Katie Hales); 24-6 (April 15, 2021 doctor's note); 24-9
(June 24, 2021 doctor's note); 31 ¶ 16).

Although it is undisputed that Plaintiff is disabled, upon careful review of the undisputed
evidence of record, viewed in light most favorable to Plaintiff, the Court concludes that Plaintiff
has failed to meet his prima facie burden to show that he was a qualified individual who could

perform the essential functions of the job.  Plaintiff alleges the existence of factual disputes that would preclude summary judgment, but he does not dispute that he was not able to return to work and still cannot work.  See (Doc. Nos. 24 ¶¶ 35–38; 31 ¶¶ 35–38); see also Garner v. Sch. Dist. of Philadelphia, 63 F. Supp. 3d 483, 489–90 (E.D. Pa. 2014) (stating that when a "plaintiff claims that he could not do his job with or without reasonable accommodation at the time of his adverse employment determination, he cannot make out a prima facie case of discrimination under the ADA").  Plaintiff also received SSDI benefits after representing that he could not work at all.  (Doc. Nos. 24 ¶ 36; 31 ¶ 36.)[24]  Plaintiff does not point to any evidence of record that would call into question the undisputed fact that he was, and still is, unable to work following the expiration of his leave of absence.  Plaintiff's failure to provide evidence on this point beyond his own statements that he was able to return to work part-time, demonstrate that he was not a qualified individual at the time of his termination.  See Smart v. Geisinger Health, No. 20-cv-02198, 2022 WL 17823682, at *8–9 (M.D. Pa. Dec. 20, 2022) (stating that an employee who was not cleared to return to work and who did not provide the employer with any documentation to that effect was not a qualified individual with a disability).  Accordingly, the Court will grant Defendant's motion for summary judgment as to Plaintiff's disability discrimination claim

---

[24]  This Court previously noted that "although this fact is not dispositive of whether Plaintiff is a qualified individual, the Court may consider it in evaluating the record as a whole for purposes of the instant motion and Plaintiff 'must somehow explain the apparent inconsistency' between [his] receipt of disability benefits and [his] claim that [he believed that he] was qualified to return to work."  See Williams v. Pinnacle Health Fam. Care Middletown, No. 18-cv-00722, 2020 WL 8991685, at *4 (M.D. Pa. Aug. 4, 2020), aff'd, Williams v. Pinnacle Health Fam. Care Middletown, 852 F. App'x 678 (3d Cir. 2021) (unpublished) (quoting Motley v. N.J. State Police, 196 F.3d 160, 166 (3d Cir. 1999)); see also Lorde v. City of Philadelphia, No. 98-cv-05267, 2000 WL 1763673, at *1 (E.D. Pa. Nov. 30, 2000) (stating that an inconsistency may arise when "a plaintiff applies for and receives SSDI benefits under the theory that []he is totally disabled and therefore unable to work yet subsequently sues [his] former employer under the ADA alleging that []he could have worked but for some discriminatory act or policy")

because Plaintiff is not a qualified individual as a matter of law and thus has failed to present a prima facie case of discrimination.

Even assuming <u>arguendo</u> that Plaintiff could show that he was a qualified individual, the Court concludes that Defendant has satisfied its burden under the <u>McDonnell-Douglas</u> test by showing that Defendant's decision to terminate Plaintiff was made for legitimate, non-discriminatory reasons.  Defendant has shown that the expiration of Plaintiff's leave of absence, coupled with Plaintiff's failure to provide documentation regarding his medical status, formed the basis of its decision to terminate Plaintiff's employment.  Because Defendant articulates a legitimate, nondiscriminatory reason for terminating Plaintiff, the burden shifts back to Plaintiff "to prove by a preponderance of the evidence that the legitimate reasons offered by [Defendant] were not its true reasons, but were a pretext for discrimination."  <u>See</u> <u>Shaner</u>, 204 F.3d at 500. Plaintiff provides no evidence to suggest that Defendant's stated reasons were pretextual and provides no grounds to discount the finding that he was unable to work (and thus received SSDI benefits).  <u>See</u> <u>id.</u> (stating that "the attainment of disability benefits is certainly some evidence of an assertion that would be inconsistent with the argument that the party is a qualified individual under the ADA").  Although a failure to demonstrate that a party is a qualified individual with a disability is fatal to a failure to accommodate claim, the Court will briefly address Plaintiff's failure to accommodate claim.  <u>See</u> <u>Hohider v. United Parcel Service, Inc.</u>, 574 F.3d 169, 193 (3d Cir. 2009) (holding that, if an employee is not a qualified individual, the employer's "alleged failure to investigate into reasonable accommodation is unimportant").

**b.      Failure to Accommodate Claim**

As to Plaintiff's failure to accommodate claim, the Third Circuit has stated that "the federal courts that have permitted a leave of absence as a reasonable accommodation under the

ADA have reasoned, explicitly or implicitly, that applying such a reasonable accommodation at the present time would enable the employee to perform his essential job functions in the near future."  See Conoshenti, 364 F.3d at 151.

First, because Plaintiff was not a qualified individual under the ADA, Defendant was not obligated to engage in an interactive process with him to provide reasonable accommodations.  See Garner, 63 F. Supp. 3d at 493 (holding that, because no reasonable jury could find that the plaintiff would have been able to perform his essential job functions, the plaintiff's request was not a reasonable accommodation under the ADA).  As noted supra, if an employee "is not a 'qualified individual' under the ADA, . . .  [the employer's] alleged failure to investigate into reasonable accommodation is unimportant."  See Hohider, 574 F.3d at 193 (quoting Gaul, 134 F.3d at 581); Shapiro v. Township of Lakewood, 292 F.3d 356, 360 (3d Cir. 2002) (noting that employee alleging failure to engage in the interactive process must show he is capable of performing essential functions of job with or without reasonable accommodation); see also Shafinisky v. Bell Atlantic, Inc., No. 1-cv-03044, 2002 WL 31513551, at *6 (E.D. Pa. Nov. 5, 2002) (stating that, when an employee is not a qualified individual, an employer "need not engage in a process designed to identify a reasonable accommodation").

Second, even assuming arguendo, that Plaintiff was a qualified individual under the ADA, Plaintiff's request for an indefinite leave of absence[25] is unreasonable as a matter of law. See Moore v. CVS Rx Services, Inc., 142 F. Supp. 3d 321, 338–39  (M.D. Pa. 2015) (observing that courts in the Third Circuit have found that an indefinite leave of absence is not a reasonable accommodation); Reifer v. Colonial Intermediate Unit 20, 462 F. Supp. 2d 621, 636 (M.D. Pa.

---

[25]  Plaintiff stated in the RSMF that he asked that his medical leave be extended "indefinitely until he figured out when he would be able to return to work."  See (Doc. No. 31 ¶ 34).

2006) (noting that it is "utterly unreasonable and not within the mandate of the ADA to expect an employer to accommodate an employee with an indefinite leave of absence"); Garner, 63 F. Supp. 3d at 493 (holding that, because no reasonable jury could find that the plaintiff would have been able to perform his essential job functions, the plaintiff's request for indefinite leave was not a reasonable accommodation under the ADA). In Moore, this Court noted that:

> to protect employers, courts have placed limits on the extent to which a leave request may even be considered a reasonable accommodation under the ADA. Byrne v. Avon Products, Inc., 328 F.3d 379, 381 (7th Cir. 2003) (Easterbrook, J.) ("Not working is not a means to perform the job's essential functions."); Reifer v. Colonial Intermediate Unit 20, 462 F.Supp. 2d 621, 633 (M.D. Pa. 2006) (Mannion, Mag. J.) ("An extended leave of absence may also be a reasonable accommodation under certain circumstances, but not if it is open-ended and indefinite."); Brangman v. AstraZeneca, LP, 952 F. Supp. 2d 710, 723 (E.D. Pa. 2013) (Brody, J.) ("The ADA does not require employers to grant indefinite or open ended disability leave . . . . Federal courts have permitted a leave of absence as a reasonable accommodation under the ADA because applying the reasonable accommodation at that time would enable the employee to perform her essential job functions in the near future.")[;] Walton v. Mental Health Ass'n. of Se. Pennsylvania, 168 F.3d 661, 671 (3d Cir. 1999) (explaining that "a blanket requirement that an employer allow such leave is beyond the scope of the ADA when the absent employee simply will not be performing the essential functions of her position" and so an employer's "decision to discontinue the accommodation does not give [Plaintiff] a cause of action").

See Moore, 142 F. Supp. 3d at 338.

Therefore, the Court will grant Defendant's motion for summary judgment as to Counts I and II. The Court turns next to Plaintiff's retaliation claims pursuant to the ADA and PHRA (Counts III and IV).

**B.     Defendant's Motion for Summary Judgment As to Plaintiff's Retaliation Claims (Counts III and IV)**

**1.     Applicable Legal Standard**

To establish a prima facie case of retaliation, a plaintiff must show: "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." See Fogleman v. Mercy Hosp., Inc., 283 F.3d 561, 567–68 (3d Cir. 2002) (quoting Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997)). Further,

> [i]f an employee establishes a prima facie case of retaliation under the ADA, the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its adverse employment action. The employer's burden at this stage is relatively light: it is satisfied if the defendant articulates any legitimate reason for the [adverse employment action]; the defendant need not prove that the articulated reason actually motivated the [action].

See Krouse, 126 F.3d at 500–01 (citation omitted).[26]  Should the employer satisfy its burden, the "plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action."  See id. at 501.  The Third Circuit further explained that, "[t]he plaintiff must prove that retaliatory animus played a role in the employer's decision[-]making process and that it had a determinative effect on the outcome of that process" and that "[t]he burden of proof remains at all times with the plaintiff."  See id. (cleaned up).  Finally,

> [t]o obtain summary judgment, the employer must show that the trier of fact could not conclude, as a matter of law, (1) that retaliatory animus played a role in the employer's decision[-]making process and (2) that it had a determinative effect on the outcome of that process. This may be accomplished by establishing the

---

[26] "In deciding a discriminatory retaliation claim," the Court must use the McDonnell Douglas test.  See Mathias v. Allegheny Valley Sch., 560 F. Supp. 354, 359 (E.D. Pa. 2008) (citing Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997)).

> plaintiff's inability to raise a genuine [dispute] of material fact as to either: (1) one or more elements of the plaintiff's prima facie case or, (2) if the employer offers a legitimate non-retaliatory reason for the adverse employment action, whether the employer's proffered explanation was a pretext for retaliation.

See id.

With regard to establishing the first element of a prima facie retaliation claim—showing that the plaintiff engaged in protected employment activity—the Third Circuit has held that the filing of formal charges, in addition to "informal protests of discriminatory employment practices, including making complaints to management," see Curay-Cramer v. Ursuline Academy of Wilmington, Delaware, Inc., 450 F.3d 130, 135 (3d Cir. 2006), are protected activities under the relevant statutes. To determine whether the plaintiff sufficiently opposed discrimination, "we look to the message being conveyed rather than the means of conveyance." See Moore v. City of Philadelphia, 461 F.3d 331, 343 (3d Cir. 2006). "The complaint must allege that the opposition was to discrimination based on a protected category, such as age or race." Daniels v. Sch. Dist. of Philadelphia, 776 F.3d 181, 193 (3d Cir. 2015). Additionally,

> although a plaintiff in a retaliation case need not prove the merits of the underlying discrimination complaint, [he] must have act[ed] under a good faith, reasonable belief that a violation existed. This standard requires an objectively reasonable belief that the activity the plaintiff opposed constituted unlawful discrimination under the relevant statute.

See id. at 193–94 (cleaned up). In other words, to establish a prima facie case, a plaintiff must present evidence that a reasonable person, "standing in [the plaintiff's] shoes," would believe that they were standing in opposition to discrimination on the part of the defendant. See Kengerski v. Harper, 6 F.4th 531, 537 (3d Cir. 2021). Further, it is well-established that a request for an accommodation is a protected activity under the ADA, provided that the employee making the request was motivated by a "good faith belief that he/she needs an accommodation." See Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 191 (3d Cir. 2003).

As to the second element of a prima facie case—demonstrating adverse action by the employer during or after the protected activity—the Third Circuit specified that:

> the plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.

See id. at 195.  Adverse actions include termination, see LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 232 (3d Cir. 2007), as well as lateral transfers to other positions, see Moore, 461 F.3d at 347–48.

Finally, as to the third element of the prima facie retaliation claim—a causal connection between the adverse employment action by the employer and the protected act by the employee —a plaintiff must introduce evidence about the "scope and nature of conduct and circumstances that could support the inference" of a causal connection.  See Farrell v. Planter's Lifesavers Co., 206 F.3d 271, 279 (3d Cir. 2000).  The Third Circuit has articulated several types of evidence that courts should consider when "determining whether a sufficient causal link exists to survive a motion for summary judgment."  See LeBoon, 503 F.3d at 232.  "Where the temporal proximity between the protected activity and the adverse action is unusually suggestive, it is sufficient standing alone to create an inference of causality and defeat summary judgment."  Id.  However,

> [w]here the temporal proximity is not unusually suggestive, we ask whether the proffered evidence, looked at as a whole, may suffice to raise the inference.  Among the kinds of evidence that a plaintiff can proffer are intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus.

See id. at 232–33 (citing Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273–74 (2001)).

26

2.      **Arguments of the Parties**

Defendant argues that Plaintiff cannot establish a prima facie case of retaliation because Plaintiff was not discharged until four (4) months after he sought an accommodation (a leave of absence).  (Doc. No. 25 at 19.)  It claims that "this lapse in time negates any inference of a causal connection between protected activity (seeking an accommodation) and his discharge."  (Id.)  Further, Defendant maintains that there is no dispute that Plaintiff was discharged due to his inability to return to work.  (Id.)  Even if Plaintiff could establish a prima facie retaliation claim, Defendant asserts that Plaintiff cannot demonstrate that his protected activity was the "but-for" cause of his discharge.  (Id. at 20.)

In response, Plaintiff asserts that he engaged in a protected activity by requesting an extended leave of absence as a reasonable accommodation and that Defendant took an adverse action against him by terminating him.  (Doc. No. 32 at 13.)  Plaintiff claims that he had a good faith belief that he was entitled to request an accommodation and that he need not prove a disability.  (Id. at 13–14.)  He also maintains that the temporal proximity of Defendant issuing the August 25, 2021 letter and the termination of Plaintiff "before giving him sufficient time to respond to the letter demanding additional information" demonstrates a causal connection.  (Id. at 14.)  Plaintiff concludes, stating that he has:

> presented sufficient information to establish an unduly suggestive temporal proximity between the initial approval of his long term disability benefits which Plaintiff requested on August 6, 2021, the denial letter on August 23, 2021, and the letter to Plaintiff and his termination on August 25, 2021 before Plaintiff could contact Defendant. It should be left to a factfinder to conclude if Defendant had a legitimate and non-retaliatory reason for terminating Plaintiff's employment.

(Id.)

**3.    Whether Defendant is Entitled to Summary Judgment on Plaintiff's Retaliation Claims (Counts III and IV)**

As discussed <u>supra</u>, in order to establish a prima facie case of retaliation, a plaintiff must show: "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." <u>See</u> <u>Fogleman</u>, 283 F.3d at 567–68 (quoting <u>Krouse</u>, 126 F.3d at 500). Although Plaintiff's discrimination claims fail as a matter of law because he was not a qualified individual and sought an unreasonable accommodation, Plaintiff is not automatically barred from asserting a retaliation claim because an unreasonable accommodation may still fall under protected conduct "if an employee has a reasonable good-faith belief that he is requesting a reasonable accommodation." <u>See</u> <u>Towne v. Crayola, LLC</u>, 22-cv-02219, 2023 WL 3060755, at *5 (E.D. Pa. Apr. 24, 2023). Additionally, "[t]he right to request an accommodation in good faith is a protected activity under the ADA." <u>See</u> <u>Wilkie v. Luzerne County</u>, No. 14-cv-00462, 2016 WL 4921032, at *8 (M.D. Pa. Sept. 14, 2016) (citing <u>Shellenberger</u>, 318 F.3d at 191).

However, even assuming that Plaintiff engaged in a protected employee activity, Plaintiff still fails to establish a causal connection between his request for an indefinite leave of absence and his termination by Defendant. "[T]he timing of alleged retaliatory conduct can, by itself, support a finding of causation only when temporal proximity between the protected activity and adverse action is unduly suggestive." <u>McGhee v. Thomas Jefferson Univ. Hosp.</u>, No. 12-cv-02919, 2013 WL 4663541, at *6 (E.D. Pa. Aug. 29, 2013) (quoting <u>Lichtenstein v. Univ. of Pittsburgh Med. Ctr.</u>, 691 F. 3d 294, 307 (3d Cir. 2012)) (internal quotation marks omitted). The parties agree that Plaintiff requested a leave of absence on April 8, 2021. (Doc. Nos. 24 ¶¶ 14–

15 ; 31 ¶¶ 14–15 ).[27]  First, as to the length of time between the request for a leave of absence

(April 2021) and his termination, Plaintiff was terminated on or around August 30, 2021, more

than four (4) months after he began his leave of absence on or around April 4, 2021.[28]  As a

matter of law, the temporal proximity here is not unusually suggestive.  See Williams, 360 F. 3d

at 759 (holding that a termination occurring two (2) months after a request is not "unusually

suggestive"); Oden v. SEPTA, 137 F. Supp. 3d 778, 791 (E.D. Pa. 2015) (finding that five (5)

months is not "unduly suggestive" timing of retaliatory motive).  As discussed supra, if the

temporal proximity is not unusually suggestive, Plaintiff can proffer other evidence such as

"intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated

reasons for terminating the employee, or any other evidence in the record sufficient to support

the inference of retaliatory animus."  See LeBoon, 503 F.3d at 232–33.

Plaintiff claims that he provided verbal communications to Defendant that he could return

to work on a part-time basis, but concedes that he never provided any medical documentation in

support.  (Doc. No. 31 ¶ 20.)  In its reply brief, Defendant notes that "Plaintiff's allegations

regarding what UNUM told [Defendant] in August of 2021 regarding its decisions on Plaintiff's

---

[27]  Plaintiff attempts to argue that the temporal proximity of him asking for "long-term disability
leave," on July 13, 2021 via email (Doc. No. 24-10) should be considered in the retaliation
analysis.  (Doc. No. 32 at 14.)  However, Defendant extended Plaintiff's leave through August
2021 up until the August 25, 2021 letter.  Additionally, Plaintiff was well-aware, as evidenced by
his email exchange with Ajayi and his acknowledgement in the RSMF, that he knew his
disability leave benefits went through UNUM and not Defendant.  (Doc. Nos. 24-10; 31 ¶¶ 9–10,
26.)  Plaintiff acknowledged in his deposition that he appealed UNUM's decision and sued
UNUM specifically for the denial of benefits, not Defendant.  (Doc. No. 24-2 (Plaintiff's
deposition transcript) at 14–15, 39–41, Tr. 26:19–27:9, 72:8–75:24.)  Even assuming that
Plaintiff's termination was unduly suggestive in proximity to his request for an extension of his
leave, Plaintiff has not proffered evidence to support the inference of retaliatory animus, as
discussed infra.

[28]  See supra at note 20.

application to UNUM for benefits have nothing to do with Plaintiff's protected activity." (Doc. No. 33 at 11.)  Although that process appears to have been frustrating for Plaintiff, the Court agrees with Defendant that those communications are not relevant to the instant retaliation claims.  Moreover, the communications between UNUM and Defendant lend support to the contention that Plaintiff was terminated because he could not return to work after his leave had expired.  Plaintiff even testified that he did not have any e-mail correspondence with Defendant past July 17, 2021.  (Doc. No. 24-2 (Plaintiff's deposition transcript) at 43, Tr. 82:5–8.) Likewise, Plaintiff offers no evidence of retaliatory animus or a "pattern of antagonism."  Since Plaintiff has not demonstrated an unusually suggestive temporal proximity or a pattern of antagonism directed at him, the Court finds that he has failed to show a causal connection between his request for accommodation and his termination.

Even assuming arguendo that Plaintiff has established a prima facie claim of retaliation, Defendant has, similarly to Plaintiff's discrimination claims, satisfied its burden under the McDonnell-Douglas test by showing that Defendant's decision to terminate Plaintiff was made for legitimate, non-discriminatory reasons and did not constitute retaliation.  Defendant has shown that the expiration of Plaintiff's leave of absence, coupled with Plaintiff's failure to provide documentation regarding his medical status in accordance with the letter sent to Plaintiff on August 25, 2021, formed the basis of its decision to terminate Plaintiff's employment. Because Defendant articulates a legitimate, nondiscriminatory reason for terminating Plaintiff, "the burden of production rebounds to the plaintiff, who must now show by a preponderance of the evidence that the employer's explanation is pretextual."  See Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir.1994).  Plaintiff provides no evidence to suggest that Defendant's stated reasons were pretextual as he did not provide the information requested.

Accordingly, the Court finds that the undisputed evidence of record would not permit a reasonable factfinder to conclude that Defendant's reason for terminating Plaintiff's employment was retaliatory.  The Court will grant Defendant's motion for summary judgment as to Counts III and IV.

**IV.   CONCLUSION**

For the foregoing reasons, the Court will grant Defendant's motion for summary judgment.  An appropriate Order follows.

 s/ Yvette Kane
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania